THE MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN

*v.*

THE PENNSYLVANIA RAILROAD COMPANY et al.

[Submitted June 7th, 1906. Decided July 18th, 1906.]

1. *P. L. 1903 p. 660 § 29* provides that when any railroad company shall not properly construct and maintain the bridges or other crossings of highways by its railroad tracks as required by law, it shall be lawful for the governing body of the township or municipality wherein such crossings are located to proceed by suit in equity to compel specific performance of the duties imposed by law on such company, and the court shall prescribe the crossing to be constructed or the repairs to be made. —*Held,* that such section was not unconstitutional because it authorized the court to give a municipality a compulsory remedy by a suit in equity for specific performance, as distinguished from the legislature's power to authorize a preventive remedy.

2. A railroad charter (*P. L. 1832 p. 104 § 20*), requiring the corporation to construct and keep in repair good and sufficient bridges or passages over or under the railroad where any public or other road shall cross the same, was a contract between the corporation and the state in the sense that it could not be altered or the franchise withdrawn, in the absence of. a power of reservation in the charter, the acceptance of which imposed on the railroad company a contractual obligation to perform the duties imposed thereby.

3. *P. L. 1868 p. 1037 § 1* authorized certain railroad companies to shorten and straighten their railroad lines, to cause the same to pass above or below any public highway or street crossing the same, and if necessary to change the location or grade so as to make the crossing more convenient, provided that the location or grade of no street or highway should be changed without the concurrence of the common council of any city or borough or a majority of the surveyors of the highways of any township in which the change might be made.—*Held*, that the township committee of a township had neither express nor implied authority under such act to grant any dispensation to one of the railroad companies mentioned therein with reference to the changing of the grade of a highway crossed by the railroad.

4. *P. L. 1868 p. 1037*, authorizing a change of location or grade of a highway at a railroad crossing, provided that the location or grade of no street or highway should be changed without the concurrence of a majority of the surveyors of the highways of the township in which the change was to be made, did not confer any authority on such surveyors to vacate in the interest of the railroad company any part of a street or reduce the width thereof.

5. Where a railroad company prepared a plan for the alteration of a highway under an overhead crossing, narrowed the roadway by the construction of abutments located in the highway, and failed to properly provide for the draining thereof, the railroad company was bound to make such alterations therein as to displace the abutments from within the lines of the highway, and to properly drain the *cul-de-sac* formed under the bridge.

6. *P. L. 1903 p. 660 § 29* provides that when any railroad company shall not properly maintain the bridges or other crossings or highways, the governing body of the township containing the crossings may proceed by a suit in equity to compel specific performance of the railroad's duties with reference thereto.—*Held*, that a suit in equity to compel the alteration of a railroad crossing was maintainable under such section, regardless of the remedies by *mandamus*, ejectment or indictment.

7. Where a railroad charter (*P. L. 1832 p. 104 § 20*) required the company to construct and keep in repair good and sufficient bridges or passages over or under the railroad where any public or other road should cross the same, the railroad company was not bound to maintain the highway under its overhead crossing in a proper state of repair.

---

On final hearing on bill, answer and proofs.

*Mr. Charles L. Corbin* and *Mr. George L. Silzer*, for the complainant.

*Mr. Alan H. Strong*, for the defendants.

PITNEY, V. C.

This suit is brought by the borough of Metuchen against the Pennsylvania Railroad Company, as lessee, and the United Railroad Companies of New Jersey, as lessor, of a section of the great through railroad route between New York and Philadelphia.

Its object is to compel the defendants to correct and remedy certain alleged defects in a crossing of the railway over Main street in the borough.

The complainant invokes this action by this court under the twenty-ninth section of the revision of 1903 of the act concerning railroads, session laws of 1903. *P. L. 1903 p. 660.*

That section, then first enacted, provides that

"When any company shall not properly construct and maintain the bridges or other crossings of highways by its railroad tracks as required by law, it shall be lawful for the governing body of the township or municipality wherein such crossings are located * * * to proceed by a suit in equity to compel the specific performance of the duties imposed by law upon such company with respect to the construction, maintenance and repair of such bridges and crossings, and the court shall prescribe the crossing to be constructed or the repairs to be made."

The twenty-sixth, twenty-seventh and twenty-eighth sections contain provisions regulating the crossings in both country and urban districts.

The defendants are operating their road under the original charter of the New Jersey Railroad and Transportation Company (*P. L. 1832 p. 104*) which, by section 20, requires that company to "construct and keep in repair good and sufficient bridges or passages over or under the said railroad where any public or other road shall cross the same."

The standing of the municipality in this court in cases of this sort was thoroughly established in the case of *Inhabitants of Greenwich* v. *Easton and Amboy Railroad Co., 24 N. J. Eq. (9 C. E. Gr.) 217,* affirmed on appeal in *25 N. J. Eq. (10 C. E. Gr.) 565,* which has been followed in many instances.

However, most, if not all, of these cases were instances of preventive remedy in which the court was asked to prevent the creation of an obstruction or *purpresture* upon a public highway.

The power of the court to compel, by mandatory proceedings,

the railroad corporation to do its duty in this respect rests, so far as I am aware, wholly upon the statute of 1903.

The particular defects which the bill seeks to remedy are three-fold.

*First.* That the bridge by which the railway tracks now cross the street encroach upon the street by its abutments and reduce its lawful width of sixty-six feet to about forty-four feet. At the same time those abutments, which are over eighty feet in length, are not parallel to the side lines of the street, but are laid at right angles to the course of the railway, which cuts the centre line of the street at a slighty acute angle, and the allegation is that the narrowing and distortion of the street seriously impedes public travel.

*Second.* That the railroad company, in order to accommodate its grade line to that of the roadway, depressed the roadway several feet, making a *cul-de-sac* immediately under the bridge with a rising grade in the street in each direction therefrom, the result of which was and is that the surface water falling on the street collects immediately under the bridge and there forms pools of water immediately after a rain.

In addition to the water that thus reaches this *cul-de-sac* a large contribution comes from the railway tracks to the east of the bridge, there being a rising grade from the bridge in that direction for a distance of eighteen hundred feet.

A few hundred feet to the east of the bridge there is a natural divide in the surface of the earth, the water on the westerly side draining towards the bridge and thence to the Raritan river above tidewater at Bound Brook, and on the easterly side toward the Rahway river.

The exigencies of the railroad company have extended this natural divide a considerable distance to the east, so far as its track is concerned, so that a considerably greater area of surface of the railway tracks than is natural is drained toward the railroad bridge and dropped by a steep declivity of ten or twelve feet into the *cul-de-sac* under the bridge, there uniting with the surface water coming from the street on each side of the railway.

At the time of the building of this bridge, which was in 1889, the railroad company attempted to provide for this surface water

by a tile drain two feet in diameter, leading from the *cul-de-sac* lengthwise under its tracks and emerging fourteen hundred feet away on the north side of their track, from which the water found its way into a rivulet emptying into the Raritan river at Bound Brook.

This drain or conduit seems to have served its purpose reasonably well up to within a few years, but has now become entirely insufficient.

I do not recollect that any expert opinion was offered in explanation of this recent inefficiency, but I think it can be easily explained from common knowledge. The surface water which reached this *cul-de-sac,* both that from the highway and that from the railroad tracks, carried with it a great deal of earth, which, on the occasion of each heavy rain, settled in this *cul-de-sac* and covered the roadway and sidewalks and had, of course, to be carted out. But a considerable portion of it found its way in the shape of very muddy water into the tile drain which had a declivity of only four and one-quarter inches in one hundred feet.

This gradient of four and one-quarter inches to the hundred feet was given by one of the engineers of the defendants and would indicate a fall of about five feet in the whole length of fourteen hundred feet. Another engineer of the defendants stated the difference of elevation of the roadway under the bridge and the outlet of the drain to be seven feet, making a fall of six inches to the one hundred feet, and showing an apparent discrepancy of the two engineers of about two feet.

As a juryman, I should say that this declivity was not sufficient to produce a rapidity of flow sufficient to produce the scouring capacity sufficient in its turn to carry all the sediment out of the tile or drain. The result is, probably, that the original carrying capacity of the drain has been seriously reduced by the subsidence and lodgment of heavy particles of earth and sand along its course.

However, be that as it may, the result of the present situation is that in times of heavy rains the roadway under the railroad is rendered nearly or quite impassable.

The *third* complaint of the municipality is that the railroad company is bound by the terms of its charter to keep that part of the street immediately under the bridge in repair, relieving the municipality of its duty in that behalf.

The railroad company admits its liability in law as to the first two items of the charges of the complainant but denies it as to the third.

Without at this moment stopping to determine the question of construction of the clause in the old charter thus raised I will proceed to consider the other defences set up by the defendant which go to the whole of the complainant's case.

And first it contends that the section of the act upon which complainant relies is unconstitutional—or, in other words, that the legislature had no power to confer on this court the right and power to give to a municipality compulsory remedy by way of compelling specific performance by a railroad company of its duties in this behalf, as contradistinguished from its power to give it a preventive remedy, such as was given in *Inhabitants of the Township of Greenwich* v. *Easton and Amboy Railroad Co., supra.*

With regard to this defence, I think it has already been disposed of by the court of errors and appeals. In the case of *Palmyra* v. *Pennsylvania Railroad Co., 62 N. J. Eq. (17 Dick.) 601,* the question was elaborately discussed by Vice-Chancellor Grey, commencing at *p. 610,* and his opinion upholding the power was adopted by the court of errors and appeals in affirming his decree. *63 N. J. Eq. (18 Dick.) 799.*

The same doctrine was reaffirmed in the Perth Amboy case. *Eckert* v. *Perth Amboy and Woodbridge Railroad Co., 65 N. J. Eq. (20 Dick.) 777.*

The court was, in both these cases, dealing with a proceeding under the thirty-sixth section of the revision of the General Railroad law (*P. L. 1903 p. 664*), which provides for compulsory proceedings to establish gates or bars across the railway. But I am unable to distinguish between the authority given by that section (36) and that given by section 29, under which these proceedings are had. The principle established by Vice-Chan-

cellor Grey's reasoning and adopted by the court of errors and appeals includes the present case. And it seems to me *a fortiori*, for section 29 merely provides for the compelling of the specific performance of a duty resting upon the railway by virtue of its original contract with the state, while section 36, as it seems to me, goes farther and compels the railroad, without regard to their original contract, to adopt and establish means to provide simply against the danger of injury arising from the inadvertence of persons crossing the railroad by a highway at a grade crossing.

I have spoken of the charter of the New Jersey Railroad and Transportation Company as a contract between it and the state. It certainly is a contract on behalf of the state in the sense that it cannot be altered or the franchise withdrawn unless the power to do so is reserved in the charter, and I think it may be properly said that the acceptance of it by the railroad company amounts to a contractual obligation on its part to perform the duties imposed upon it thereby. Thus it seems to me that the jurisdiction given to this court by section 29, *supra*, is cognate to the familiar jurisdiction of this court to compel the specific performance of contracts.

The next defence set up by the defendant is that the present arrangement of the crossing was adopted by and with the consent and acquiescence of the then municipal authorities, the township committee of the township of Raritan (the borough of Metuchen had not been organized at that time) and by the consent of the surveyors of the highway of that township.

The legislative authority invoked by the defendants for this is found in the session laws of 1868 (at *p. 1037*), being "An act relative to the Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company."

The first section authorizes the companies to shorten and straighten any part of their railroad lines and to cause the same to pass above or below any public highway or street crossing the same, and if necessary to change the location *or grade* of such highway or street so as to make the crossing more convenient

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"provided that the location or grade of no street or highway shall be changed without the concurrence of the common council of any city or borough, or a majority of the surveyors of the highways of any township in which such change may be made."

It will be seen that the then governing body, namely, the township committee of the township, is not mentioned, and no authority is given even by implication to that committee to give any dispensation whatever to the railroad company. The whole jurisdiction in that respect here in question is vested in the two surveyors of the highways of the township. The defendants at the hearing attempted to prove that they had such a document executed by the then two surveyors of the highways of the township of Raritan which permitted this change to be made precisely in the way it was made. At the hearing what purported to be a copy of such a document was produced purporting to be signed by two men, Messrs. Tappen and Stell, both still living, but the original was not produced nor was any proof given of its actual existence. At the close of the evidence leave was given to counsel for the defendants to supply the proof of the existence of the original document, but no such proof was ever produced, and counsel for the defendants afterwards stated to me personally that they had been unable to produce it, and no reliance was placed upon it in the written argument of that counsel.

But it is to be observed that the proviso above quoted contains no authority on the part of the surveyors of the highway to vacate, either in whole or in part, or to reduce the width of any street or road.

Whatever municipal authority was shown to exist for the present arrangement is found in an entry on the minutes of the township committee of Raritan township, as follows:

"METUCHEN, New Jersey, May 18th, 1889.

"The town committee met at the clerk's office for the purpose of notifying the Pennsylvania Railroad Company to change width of sidewalks and extend width of roadway *south of the track on Main street. Resolved,* That the Pennsylvania Railroad Company be authorized to make the sidewalk six feet wide instead of ten, and to add to the roadway eight feet taken from the sidewalks, making the roadway twenty-five feet wide instead of seventeen."

"METUCHEN, N. J., May 18th, 1889.

"*Mr. E. F. Brooks, Engineer, Maintenance of Way, Pennsylvania Railroad Company:*

"DEAR SIR—In accordance with the resolution passed this day by the township committee of Raritan township, you are authorized by them to make the sidewalk six feet wide instead of ten, throwing the other eight feet into the roadway, and we will release you from all responsibility that will arise hereafter.

"JOSEPH L. HAHN, *Chairman.*

"L. H. TAPPEN.

"JOHN ROBINSON, *Town Clerk.*

"Approved by the committee, June 1st, 1889.

"JOHN ROBINSON, *Town Clerk.*"

This entry shows plainly on its face that it referred wholly to the width of the road to the south of and outside of the bridge in question.

In order to accommodate the grade of the highway to the grade of the railroad the defendants made a deep cut in the highway on the south side of the bridge, with sloping banks, thereby narrowing the usable width of the road which previously, according to the evidence, had been opened and used on both sides of the railway substantially to its lawful width of sixty-six feet. And to the roadway in these cuts the resolution refers.

But granting that the resolution recognizes the narrowing of the street under the railway, and granting, what is alleged by the defendants, but not proven, that such narrowing was done with the acquiescence and tacit consent, not only of the township committee but of the inhabitants of the vicinity, there yet remains two complete answers to the defence so far as defendants rely thereon.

*First,* that the township committee had no authority in law to vacate any part of the public highway or to authorize any occupation thereof or obstruction to be placed thereon by the railroad. *City of Hoboken* v. *Hoboken Land and Improvement Co., 36 N. J. Law (7 Vr.) 540.* And the case is clearly not within the doctrine of the case of *Easton and McMahon* v. *New York and Long Branch Railroad Co., 24 N. J. Eq. (9 C. E. Gr.) 49.*

In the *second* place it is quite clear that the bridge and its width and location, and the change in the grade of the street,

were wholly the device and plan of the defendants, who are responsible therefor, and however ample it may have been to accommodate the travel as it existed at the date of its construction, the evidence satisfies me that it is not sufficient for that purpose at the present time, and hence the case is brought within the rule which was established by the supreme court in *Central Railroad of New Jersey* v. *State, 32 N. J. Law (3 Vr.) 220.* There the chief-justice, speaking for the supreme court, was dealing with the clause in the charter of the Central Railroad of New Jersey, corresponding with and substantially similar to that which imposes the duty on the defendant railroad to maintain passages over or under its railroad, above cited. He uses this language:

"This provision, it will be perceived, imposes a duty on the company in favor of the public. It is to be taken most strongly against the corporation, but it is to receive a reasonable construction. It is a continuing duty to which the company is made subject, which, in its performance, must be measured by circumstances. Thus a bridge or a passageway, which at one time would be adequate to the public accommodation, might, at a subsequent period, from an increase of business or population, be totally inadequate, and consequently a provision which at one juncture would be a discharge of the duty, would, at another, amount to its infraction. Suppose a public street in a town to have been originally laid by the company over the surface of their track, and that by reason of the growth of their business at that locality their trains should pass in such quick succession as to render such street almost impassable, under these circumstances could it be pretended that the company could discharge themselves from the obligation which the section in question imposes, except by passing the street thus obstructed under their road, so as to restore it to public use. The duty prescribed is to keep at all times and under all circumstances the public highways, at the point where they cross the railroad, in a condition fit for safe and convenient use."

That principle has been restated in so many instances by the judges of this state as to have become thoroughly imbedded in our laws. See the opinion of Chancellor McGill in *Township of*

*Raritan* v. *Port Reading Railroad Co., 49 N. J. Eq. (4 Dick.)*
*14,* and *Reed* v. *Camden, 53 N. J. Law (24 Vr.) 322 (* at *p. 326),*
and later on in *Palmyra* v. *Pennsylvania Railroad Co., supra,*
and the additional cases there cited.

If, then, the passageway under the railroad provided by the
defendant in 1889 has become insufficient, it is the defendants'
duty, under the language of their charter, to cause that passage-
way to be enlarged.

It was not contended that the clause in question found in
defendants' charter, or any other clause or legislative grant,
authorized the defendants to put the abutments or supports of
their bridge within the lines of the street, except that they have
the right to plant posts for support to their structure on the edge
of the sidewalks, giving an increased width to the outside of the
sidewalks from their own right of way. This right is given by
a proviso in section 27 of the revision of the act concerning rail-
roads. *P. L. 1903 pp. 659, 660.*

I find, therefore, that the defendants have no excuse, either at
law or in equity, as to the first two charges against them, namely,
the placing of the abutments to their bridge within the lines of
the street, and the failure to properly drain the *cul-de-sac* which
they have formed therein.

But, say the defendants, this court ought not to exercise
jurisdiction, because there is an ample remedy at law, either by
*mandamus,* ejectment or indictment.

The remedy by *mandamus* was so thoroughly dealt with by
Vice-Chancellor Grey, in his opinion in the *Palmyra Case, supra,*
commencing at the bottom of *p. 615, 62 N. J. Eq. (17 Dick.),*
that I will only refer to it. The learned vice-chancellor was
indeed dealing there with the constitutional question, but what
he says applies with equal force to the present situation and
shows the inadequacy of such a proceeding. It lacks the plia-
bility and adaptability to special circumstances which the remedy
in this court affords. It is true that there is a remedy at law by
*mandamus* to compel a railroad company or a canal company to
build a bridge across such railroad or canal. It was so decided
in this state by the supreme court in the *Trenton Water Power
Co. Case, 20 N. J. Law (Spenc.) 659,* and Mr. High, in his work

on *Extraordinary Legal Remedies* (at §§ *319, 320*), dilates upon the subject, and comes to the same conclusion. But I have found no authority which goes to the length that the remedy by *mandamus* is efficient to adjudge a structure already existing as inefficient or to be a public nuisance and to order its removal and the substitution therefor of a proper structure, or to define what a proper structure should be.

Moreover, it seems to me that the statute above cited, giving this court jurisdiction, gives the remedy in this court a sort of preference over other known remedies, and declares in advance that this court shall and may assume and exercise jurisdiction without stopping to carefully examine and strike a balance between the adequacy of the remedy at law whether by *mandamus,* ejectment or indictment, and that in this court. It may be admitted that each of these remedies are open to the complainant.

The remedy by ejectment was recently maintained by Justice Pitney sitting in the Passaic circuit court.

But the question arises, what would the complainant do with a judgment in its favor giving it possession of the ground within the limits of the highway occupied by the abutments of the defendants' bridge, and how would that judgment be used to widen the road except by destroying the bridge and interrupting travel over a great public highway?

Then with regard to the remedy by indictment. The same criticism arises. Suppose the indictment found and conviction under it and an order to abate the nuisance. What would the sheriff do?

But, after all, to speak with perfect frankness, the sentiment of the bench and bar as to the adequacy of indictment in cases like the present has changed and advanced within late years. As early as the case of *Hoboken Land and Improvement Co.* v. *Hoboken, 36 N. J. Law (7 Vr.) 540 (1873);* Justice Depue, speaking for the court of errors and appeals, says: "Where the public easement is such that possession, exclusive of any interference by the owner of the fee, is essential for its improvement, regulation and enjoyment, the only appropriate action to obtain the possession is ejectment. To deny this form of relief and remit the public to a remedy by an indictment for a nuisance

would result in subjecting public rights to the varying moods of grand juries."

The learned judge was there dealing with the choice between ejectment and indictment, that is, between a civil remedy and a criminal remedy, and his reasoning applies here, and is supported by the *Trenton Water-Power Case, supra.*

And Vice-Chancellor Emery, in *Grey* v. *Greenville and Hudson Railroad Co., 59 N. J. Eq. (14 Dick.) 372* (at the bottom of *p. 387*), says: "The uncertainty of protecting public rights in highways by indictments against nuisances was one reason for the establishment of the doctrine that these public rights should also be protected by ejectment and by injunction pursued by the municipal bodies vested with the control of the highways." And he then quotes the language of Justice Depue which I have just quoted.

In support of his position in this behalf, counsel for defendants cites a long line of cases culminating in that of *Inhabitants of the Township of Raritan* v. *Port Reading Railroad Co., 50 N. J. Eq. (4 Dick.) 11 (1891)*, decided by Chancellor McGill.

That case is also relied upon by the complainant in support of its position on the lack of right of the railroad company to narrow the highway, and is precisely in point on that subject.

But while deciding, as he did, that the duty of the railroad company was to place the supports of its bridge entirely outside the line of the highway (in that case fifty feet wide), he declined to grant an injunction on the ground that its proposed structure, which was to be supported by abutments only twenty-five feet wide, was entirely ample for all present and immediately prospective travel over the highway, and he remarked that under the doctrine of the *Central Railroad Case*, above cited (*32 N. J. Law (3 Vr.) 220*), it would be the duty of the railroad company to widen the passageway whenever the public travel required it, and after asserting the power of the township to maintain its suit for preventive remedy in this court, he refused to grant the injunction on the ground "that the travel over the highway is merely nominal, and that the roadway in use consisted of a single wagon track, and that the highway on each side of the wagon track where the abutments are being erected

is under brush and weeds, so that for all practical purposes the twenty-five-foot space between the abutments will be ample for the public accommodations at present and, perhaps, for years to come." He then remarked that the remedy by indictment was sufficient to abate the nuisance and restore to the public the use of the entire highway. The latter remark was entirely unnecessary for his decision, and it is entirely clear that it was based upon the facts in the case which showed that no practical inconvenience would arise to the public from the contemplated encroachment. And it is equally clear that had the circumstances justified it he would have granted the injunction.

I am therefore of the opinion that the complainant is entitled to relief as to the first two charges above mentioned, namely, the location of the abutments of the bridge within the limits of the road and the insufficient drainage of the *cul-de-sac* which defendant has created in the grade of the highway.

I stop here to say that the railway company, at the hearing, presented a plan which it had devised to remedy this collection of water by entirely diverting all the surface water which comes down to the bridge from the long strip of railway to the east thereof. It may be that if it succeeds in such diversion the present long drain will be sufficient to carry away the water which accumulates there from the surface of the highway.

I come now to the third duty which the complainant asserts rests upon the defendants and which they have not performed, and that is the maintaining in good order the highway under the bridge.

The language of the obligation is this: "To construct and keep in repair good and sufficient bridges or passages over or under the said railroad where any public or other road shall cross the same."

I am unable to follow the very ingenious argument of the counsel for the complainant in support of his construction of that clause of the act. I think that the words "construct and keep in repair" applies wholly to the word "bridges." It may be said that the railroad will, in self-protection, so to speak, keep a bridge like this, which conveys the railroad over the highway, in good repair. But that consideration does not apply to the

case where the bridge is erected to carry the highway over the railroad. The words "keep and repair" were intended to apply to the latter class of bridges and do not, in my judgment, apply to the word "passages" under the railroad. This, I think, is the reasonable construction. The object of the legislature was to prevent the railroad company from imposing upon the public any increased burden by reason of the railway crossing. Hence, where there is a crossing at grade, it is the duty of the railroad to keep in repair with proper planking, &c., so much of the highway as is immediately affected by the presence of its ties and rails. In the present case the burden of the public is not increased by the crossing except so far as the road is rendered more liable to fall into disrepair by the change in its grade and the accumulation of water in the *cul-de-sac.* But in these cases it must be borne in mind that the general traveling public over the railroad are to be considered, and that it has always been considered to be proper in adopting plans of crossings to avoid crossings at grade, and to that end that the wagonway should be somewhat depressed where necessary. But I do not see upon what principle under the statute the depression in this case can be held to impose on the railroad company the expense of keeping that part of the road in repair.

No evidence was adduced at the hearing, nor any suggestions made at the argument, as to what remedy the court should adopt with regard to the narrowing of the highway both immediately under the bridge and on each side thereof, and I have not given the subject consideration. With regard to the drainage of the *cul-de-sac* I am inclined to think the defendants' plans presented at the hearing should be subjected to the actual test. But upon these matters I express no definite opinion. They are proper subjects for consideration and further evidence on the subject will be provided for by the decree which I shall advise upon notice to the solicitors.